# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00511-CV

---

**M. R. and J. L., III, Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 23DFAM337658, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

After a hearing, the trial court terminated the parental rights of M.R. (Mother) and J.L., III (Father), to J.L., IV (Child), on four identical grounds and a determination that termination of parental rights was in Child's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O), (b)(2). Both parents contend that the trial court abused its discretion in admitting into evidence the Removal Affidavit and a home study from Florida. They also contend that the evidence was legally and factually insufficient to support each of the grounds for termination and the best-interest determination. We will affirm the decree terminating appellants' parental rights.

# BACKGROUND[1]

Child was born in December 2017. Child lived with Father and Mother in South Texas until he was three years old. The Permanency Report includes a report of neglectful supervision of Child by both parents in March 2021 that the Department found reason to believe. In October 2021, Father and Mother sent Child to live with Father's adult daughter in Temple, Texas. The adult daughter later gave possession of Child to an unrelated caregiver who in turn took Child to the hospital in December 2022 and reported that he was exhibiting bizarre behaviors. According to the Permanency Report, Child threatened violence to a thirteen-year-old home member and harmed dogs, among other disturbing behaviors. The caregiver did not feel capable of meeting Child's needs.

The Department filed this suit and was appointed Child's temporary managing conservator on March 9, 2023. The Permanency Report states that the Department found reason to believe that Father and Mother had abandoned Child as of March 19, 2023. Father and Mother were reportedly homeless in Brownsville, Texas, and the Department was unable to find them. Letters were sent to last known addresses and to family members. On May 11, 2023, Mother's grandmother reported that she spoke with Mother and Father on the telephone, let them know that Child was in the Department's care, and gave Mother the conservatorship worker's telephone number. The Department reported that law enforcement had been unable to locate the parents in May 2023. Father and Mother were represented by attorneys ad litem until they were located and began participating in hearings in the fall of 2023 along with their attorneys.

---

[1] This background section is drawn from testimony and evidence whose admission is not challenged in this appeal. The State relies in its brief on a Removal Affidavit whose admission Father challenges.

Mother and Father first appeared in a court hearing on this case by telephone on October 31, 2023. The Permanency Report filed December 8, 2023, contained the service plan for the parents requiring that they participate in a psychological evaluation, individual counseling, and weekly drug testing; contact the Department every two weeks to provide a status report; obtain or maintain employment to meet their needs and Child's needs; and demonstrate their ability to meet Child's basic needs and ensure his safety. The parents did not participate in the psychological evaluation or individual counseling or contact the Department as required. Mother was drug tested once; her hair-follicle test was positive for cocaine use, though her urine test was negative. Father never participated in the drug testing required in this case.

The final hearing stretched across three days in May and June of 2024. The Department's conservatorship worker testified that the parents did not participate in services. She said that the Department was concerned most about their failure to participate in the drug tests. She testified that the parents appeared intoxicated in a previous video hearing, but conceded that she saw only their faces and could not assess smells or other indicia of intoxication. She testified that the parents had not visited Child and that she believed visits were not a good idea. She said that she had not spoken with Mother recently because Mother did not respond to calls; Father had called her in March 2024. He told her that he did not join Mother in the March 2024 drug test because he was mowing lawns to earn money; he was waiting to participate in services until he could buy land for housing. The conservatorship worker testified that Child had previously had breakdowns and behavioral issues including harming animals and a lack of attachment to anyone, but with counseling and attachment to his foster parents he no longer had those problems and was doing well in school. She testified that Child expressed that he would like to stay with the foster parents because "he says they saved him." The

3

conservatorship worker said she opposed a proposed placement of Child with his maternal great-grandparents in Florida because of a history of domestic violence and alcohol abuse in that home.

Both Mother and Father testified that they had not seen Child since sending him to Father's daughter in 2021. Mother testified that she did not appear at hearings because she did not have her telephone in March and April of 2023. She admitted to not participating in a psychiatric evaluation, counseling, or contact with the conservatorship worker because she has been really busy with her online college coursework. She agreed with the statement that she would not change or modify her behavior because it is "just fine." She said that she does not use cocaine, coffee, or cigarettes, and that Father does not use drugs.

Father testified that he understood the services he was required to participate in, including drug tests. He said he did not drug test because, "[I]f I can't provide a home for him, then there's no reason for me to keep doing this over and over." He said he did not use drugs. Father testified that he tried to take the psychiatric evaluation, but he and the provider kept missing each other. Father testified that he kept losing his phone or not charging it and that he does not like using his phone. He said that he sent his daughter support for the first month after he sent Child to daughter in Temple, but that he stopped when local Department personnel told him not to contact her or Child. He said he thought he had lost his parental rights. Father testified at the final hearing that he and Mother had applied for an apartment and expected to be approved. He said he took parenting classes while incarcerated, years before Child was born,[2] and would take more classes related to this case after getting a place to live. Father proposed

_____

[2] Father asserted that he had not been arrested since 2013 and had been out of jail since 2017 or 2018.

that Child could be placed with Child's maternal great-grandparents in Florida as an alternative to immediate return to him and Mother.

Child's counselor testified regarding Child's challenges and progress, as did the foster parents. The counselor testified that Child has made progress but needs permanence. He said that Child does not talk directly about his birth parents; Child has tearful episodes talking about missing his family, but it is not clear who he is talking about. The counselor said that, while generally children benefit from maintaining family connections, that is not necessarily true in Child's case. The counselor testified that Child is very fragile and that his caregivers must have knowledge and skills to parent Child, which the foster parents have. Child's foster mother testified that Child was very emotional at first and feared every day he would not be with them the next day. He talked a lot about violence and killing and would cry every day for hours. After about three months he started feeling more at ease and has made a lot of progress with regulating his emotions. Both foster parents testified that they want to adopt Child.

Child's attorney ad litem recommended termination of Father's and Mother's parental rights and adoption by the foster parents. She testified that, when she met him, Child was emotionally fragile and constantly asked, "Why does no one want me?" She testified that the foster parents have re-parented him and never asked for a respite or a new placement. She testified that they have made Child strong and confident.

The trial court found four grounds for termination of Father's and Mother's parental rights under Texas Family Code Section 161.001(b)(1)(D), (E), (N), & (O). The trial court also found that termination was in Child's best interest.

**DISCUSSION**

Both parents challenge the legal and factual sufficiency of the evidence to support all four grounds for termination as well as the best-interest finding. Father additionally contends that the trial court abused its discretion by admitting the Removal Affidavit and a home-visit document from Florida into evidence. He also contends that the trial court abused its discretion by terminating his parental rights and by appointing the Department as managing conservator of Child. We will reserve ruling on whether the admission of the objected-to Removal Affidavit and home study harmed the parents until we have discussed the evidence relevant to the substantive termination issues.

## I. The general standards of proof and review are familiar.

"To terminate parental rights, the factfinder must find by clear and convincing evidence that (1) at least one of the termination grounds set forth in Section 161.001(b)(1) or other sections of the Texas Family Code applies, and (2) termination is in the best interest of the child." *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024). "Clear and convincing evidence 'will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting Tex. Fam. Code § 101.007). This "higher standard of proof" is required "[b]ecause the termination of parental rights implicates fundamental interests." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014).

An appellate court conducting a legal sufficiency review in termination cases considers all evidence in the light most favorable to the trial court's finding, as well as any undisputed contrary evidence, to determine whether a reasonable factfinder could have formed a firm belief or conviction that it was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). "Courts

'must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' but courts 'should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *In re C.E.*, 687 S.W.3d at 308 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

In a factual sufficiency review of a termination finding, the appellate court considers and weighs disputed evidence contrary to the trial court's findings against the evidence in favor of the finding. *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* However, appellate courts "provide due deference to the decisions of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d at 503. We cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108-09 (Tex. 2006); *see In re C.E.*, 687 S.W.3d at 314 (stating that factfinders are "entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case").

**II.     Legally   and   factually   sufficient   evidence   supports   termination   under Subsection (E).[3]**

The Family Code authorizes termination of parental rights if the parent knowingly engages in conduct or knowingly places a child with persons who engage in conduct that endangers the child's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E).

Mother contends that there is no evidence that Child was removed from conditions or surroundings that endangered his physical health or emotional well-being. She notes that he was removed from a caregiver who took over from his half-sister with whom he was placed before this case. She contends that no evidence shows that either interim caregiver ever harmed Child or exposed him to an endangering environment, much less that Mother knew of any endangering conditions. She contends that no evidence connects her one positive drug test to endangerment of the child.

Father also disputes that any evidence shows he knowingly endangered Child. He cites the Removal Affidavit as showing that the placement with his adult daughter resolved concerns raised in previous Department involvement with Child. He admitted that he had been imprisoned for ten years for aggravated assault and later jailed for robbery and organized crime, but asserted that he had not been arrested for anything since 2013 and had been out of jail since about 2018.

---

[3] Because termination under Subsection (D) and (E) has collateral consequences in subsequent termination cases, we must review those grounds even when termination is supported on other grounds. *See In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019). However, because those collateral consequences are identical regardless of whether termination is supported under Subsection (D), Subsection (E), or both, we need review the sufficiency of evidence to support only one of those grounds. *J.B.M.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *8 (Tex. App.—Austin Apr. 13, 2023, pet. denied) (mem. op.). *But see id.* at *12-*14 (Theofanis, J., concurring) (opining that courts should review sufficiency of evidence of findings under both Subsections (D) and (E) when challenged).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861 at *4, (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). A parent's endangering conduct need not be directed at the child nor must the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Instead, endangerment encompasses a larger array of conduct that exposes a child to loss or injury or jeopardizes the child. *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024). A factfinder may infer endangerment from a course of conduct that presents substantial risks to the child's physical or emotional well-being. *Id*. These risks "can be developed by circumstances arising from and surrounding a parent's behavior"; however, they "must be more than 'a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *Id*. (quoting *Boyd*, 727 S.W.2d at 533). The conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt*, 2010 WL 5463861 at *4. "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id*.

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied); *see In re C.E.*, 687 S.W.3d at 310 (stating that subsection (E) "requires that a parent's conduct endanger the child's physical or emotional well-being" but that "[p]roof that a parent specifically caused an injury is not necessary"). "Additionally, termination under

9

subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d at 262. The relevant time period for Section 161.001(b)(1)(E) includes parental conduct occurring "both before and after the child has been removed by the Department." *D.N.-B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00092-CV, 2020 WL 4462327, at *2 (Tex. App.—Austin July 24, 2020, pet. denied) (mem. op.).

While a finding of endangerment based on drug use alone is not automatic, a parent's positive tests during the pendency of a termination case supports a finding that the parent's illegal drug use is an ongoing habit that created an endangering environment for the child. *D.H. v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 61 (Tex. App.—Austin 2021, no pet.). This is because a parent's ongoing drug use jeopardizes the parent-child relationship and subjects the child to a life of uncertainty and instability. *Id.* at 62. Pervasive drug use can cause a reasonable inference that the drug use is endangering even in the absence of evidence that drug use caused an endangering activity or that it occurred while the children were in the parent's direct care. *Id.* at 61. The factfinder may infer from a parent's skipping Department-requested illegal-drug tests during a parental-rights-termination suit that the tests missed would have been positive. *T.D. v. Texas Dep't of Fam. & Protective Servs.*, 683 S.W.3d 901, 914 (Tex. App.—Austin 2024, no pet.).

Both parents undisputedly missed months of weekly drug tests required by their service plan. Mother tested once, showing positive for cocaine use. The inference that parents would have tested positive when they missed drug tests conflicts with their denial of drug use, leaving the trial court with a credibility determination regarding their denial of drug use that we cannot second-guess. *H.R.M.*, 209 S.W.3d at 108-09. Even if we discount the period before the

10

parents appeared at a hearing, they missed weekly drug tests beginning October 31, 2023 and continuing through the hearing in May and June 2024 while at risk of losing their parental rights.

Parents can exhibit endangering conduct when subjecting their children to unsafe and unstable housing arrangements. *T. D.,* 683 S.W.3d at 914. Father testified that the parents had no consistent housing for three years since Child went to live in Temple. He said they had lived with family and friends or hotel rooms for a week or two. He said he had slept on the street a couple of months before his testimony; sometimes he would sleep on the streets for a day, sometimes for a week. He testified at the second hearing that he had an appointment to get a two-bedroom apartment. At the third hearing a week later, he testified that he had applied for a three-bedroom apartment and expected to get it. Child's foster mother and counselor testified that Child had great anxiety regarding whether he would remain in the same place the next day. The foster mother testified that Child's anxiety began to ease after three months living with her and her husband. The counselor testified that after a year, Child was only coming to feel that he could stay with them though he was not "solidly there" yet.

We conclude that the unobjected-to evidence is legally and factually sufficient to support the trial court's termination of Father's and Mother's parental rights under Subsection (E). *See* Tex. Fam. Code § 161.001(b)(1)(E); s*ee also T. D.,* 683 S.W.3d at 914; *D.H.*, 652 S.W.3d at 61.

Because we find the evidence legally and factually sufficient to support termination under Subsections (E), we need not consider the sufficiency of the evidence to support termination under Subsections (D), (N), and (O). *See* Tex. R. App. P. 47.1; *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003); *J. B. M. H. v. Texas Dep't of Fam. & Protective Servs.*,

11

No. 03-22-00661-CV, 2023 WL 2920315, at *8 (Tex. App.—Austin Apr. 13, 2023, pet. denied) (mem. op.).

### III. Termination of Father's and Mother's parental rights is in Child's best interest.

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. Although a parent's behavior may reasonably suggest that a child would be better off with a new family, the best-interest standard does not permit termination merely because a child might be better off living elsewhere. *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.). "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

Every Department witness described Child as having emotional troubles that he was learning to cope with such as dealing with frustration, attachment, and abandonment fears, while the parents testified that Child had no problems when they turned him over to Father's adult daughter in 2021. Child's counselor described Child as fragile and testified that Child's caregivers will need to have knowledge and skills to parent Child; he testified that the foster parents—a college professor and an engineer—have those skills and have used them successfully to Child's benefit. The foster mother testified that she believed Child wished to remain with her and that he has bonded with both her and her husband. She testified that it would be catastrophic to Child's well-being to leave their home. The conservatorship worker testified that, when she visited the foster parents' home, she found them to be very hands-on, attentive, and caring and described Child as very happy, active, and energetic. They had set up summer tutoring to help Child catch up academically. The Department and Child's guardian ad litem agreed with the foster parents' plan to adopt Child.

Mother and Father described themselves as good parents, but their failure to engage in a psychological evaluation or counseling or to regularly contact the Department as required left a void in evidence of their capabilities except for the dissonance between their self-described good parenting and Child's emotional condition two years after leaving their care. Mother said she loved Child, and Father said Mother had been a good caregiver for his aging mother. Father said Child needs a lot of food and attention, but that child-rearing will get more complicated when Father has to monitor Child's homework and friends and take him to the doctor, for shoes, and everything else when needed. Father said he had bought clothes for Child. He said he had taught Child to say "yes," "no," and "thank you" in English, Spanish, French, and German (languages Father speaks) so that he could be polite. Father said he had taken parenting

classes while incarcerated, had attended college, and that he had a good relationship with his adult children. He hoped to give child the opportunity to do what he wanted such as play an instrument or sports. Father said he had investigated some schools but had not yet contacted a counselor for Child and asserted that he would not put Child on medications as the Department had done because of their lasting effects. Father said he wanted Child to have contact with older members of the family.

While services are available to assist the parents, they had steadfastly resisted or failed to avail themselves of the services offered them during the pendency of this case when that lack of participation weighed against their ability to regain possession of Child. Father said he would engage in services if the Child were returned to him. This contrasts with reports of the foster parents' cooperation with the Department's services for Child during his time with them.

The parents contend that their conduct can be excused by their limited resources and perhaps by some learning challenges Mother may have. Yet, despite claiming an inability to maintain a phone such that they could contact the Department and participate in services, Mother was reportedly taking college classes online. Father said that he sent Child to Temple with his daughters where he thought Child would be safe. Father said they did not contact Child or the daughter or send support for three years because the Department told them not to do so, but the parents also did not contact the Department regularly as required by their service plan even after learning that their parental rights were intact, but under review.

The only instability noted in placement with the foster parents was the statement that they were going to move soon, thus ending Child's relationship with his counselor. By contrast, Father described a recent history of homelessness and instability in their living situation that he expected would be remedied by the apartment application he had filed. Mother described

14

her college coursework as occupying her time such that she could not contact the Department or participate in services as required.

Father's proposed temporary placement of Child with Mother's great-grandparents in Florida prompted concerns about spousal abuse and alcohol abuse by the great-grandfather. The Department's conservatorship worker testified that she did not favor that placement because of "several domestic violence and alcohol abuse concerns." She testified that she would still have those concerns even if the maternal great-grandfather—the alleged perpetrator of some incidents of domestic violence—were excluded from the home. On cross-examination by Father's attorney, the conservatorship worker testified that she had reviewed affidavits from the Palmetto Police Department that were in evidence describing an incident in which the great-grandfather, while intoxicated, struck the right side of the great-grandmother's forehead with his closed fist, and another in which, while intoxicated, he yelled at the great-grandmother, pinned her to the couch, and grabbed her leg and squeezed it painfully against her will. The conservatorship worker also testified that she had heard the great-grandmother testify at a previous hearing and that, because the great-grandmother was dismissive of the domestic violence allegations, the worker would not be able to fully trust that she would make the right decision to keep Child safe.

Father testified that he was not concerned by great-grandfather's seven prior arrests for abusing great-grandmother because he is "like 90 years old. He can barely walk. . . . I don't understand what you're scared for or what you think would happen." When the Department's attorney noted that the last arrest occurred seven years earlier, Father responded "I don't know how they settle things, but I know that that's his real grandparent." Father placed

great importance on connecting Child to his living familial elders from whom he had been disconnected during the pendency of this case.

The objected-to Florida home study report states that great-grandmother said the domestic abuse was due to great-grandfather's drinking, that he had stopped drinking, and that the last abuse occurred in 2017. The home study also recites the great-grandparents' eagerness to care for Child, their assertion that Child would have their sole attention, and their willingness to do whatever is required of caregivers and to be permanent conservators if the parents did not complete their services. The home study includes a statement from another great-grandson who said he sees the great-grandparents every day and "has no concerns for their ability to care for the child as they have cared for him as well." It also states, "The family will be a great support to each other when caring for the child. They will also have the support of friends and extended family." However, the home study ultimately recommended against placement "due to concerns of [great-grandfather's] backgrounds."

Child's reported growing attachment to the foster parents and his reduced anxiety about being sent away from them indicate that his desire is to stay with the foster parents. His counselor described tearful episodes about being separated from his family, but it was not clear to which set of caregivers he was referring. The conservatorship worker testified that Child had said that he would like to stay with the foster parents because "in his words, he says that they saved him.

Even disregarding the objected-to evidence from the Removal Affidavit and the objected-to home study, the evidence is legally and factually sufficient to support the trial court's finding that termination of Father's and Mother's parental rights is in Child's best interest.

16

**IV.     The remaining issues do not present reversible error.**

     **A.     The admission of the Removal Affidavit did not harm the parents.**

The parents objected to the Removal Affidavit on grounds of "[h]earsay and lack of foundation." The Removal Affidavit provided additional information that the parents used drugs in 2020 and 2021 while Child was in their sole care, that Father put Mother on the street for prostitution to earn money to buy drugs, and that the child lived in a home where others came to use crack cocaine. The Removal Affidavit included a report that Child did not present marks or bruises that could indicate abuse or neglect and that police reports did not include concerns for such neglect or abuse, but it also included reports that the Child appeared dirty and neglected and that the parents' drug use put Child's well-being at risk.

The parents also complain of the admission of a Florida home study that was not produced to them less than an hour before the third day of the hearing began and just over two months after the Department received it. The Department's attorney admitted it was a surprise, stating that he had not seen it before that day. The Department's conservatorship worker said she was unaware of the report before that day as well.

Even if we assume the trial court erred in admitting this evidence, error in the admission of evidence can be waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004). Further, even if the trial court erred by admitting the affidavit, the admission must be such a denial of the parents' rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See State v. Central Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). "To put it another way, a successful challenge to evidentiary rulings usually requires the complaining party to show that

17

the judgment turns on the particular evidence excluded or admitted." *A.B. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00658-CV, 2018 WL 1220894, at *5 (Tex. App.—Austin Mar. 9, 2018, no pet.) (mem. op.) (quoting *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000)). In making this determination, the court must review the entire record. *Central Expressway Sign Assocs.*, 302 S.W.3d at 870. The erroneous exclusion or admission of evidence "is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Id; A.B.*, 2018 WL 1220894, at *5.

We conclude that any error in the admission of the Removal Affidavit was harmless. As set out above, the record contains evidence of drug use and instability that supports the endangerment finding without reference to the allegations in the Removal Affidavit.

We also conclude that any error in the admission of the late-produced Florida home study was harmless. First, we note that the home study is about the great-grandparents—not allegations about the parents—and concerns only one of the subissues in the best-interest analysis. Second, the allegations of abuse in the objected-to home study were already in testimony and two police reports concerning great-grandfather's assaults were admitted. Third, an earlier home study that the trial court opined looked similar, albeit with a recommendation favoring placement of Child with the great-grandparents, was admitted. Fourth, though the challenged home study recommended against placing Child with his great-grandparents, the stated basis for that recommendation (great-grandfather's history of drinking and abusive behavior) was already in the record, and the challenged home study otherwise contained much information favorable to the great-grandparents. Finally, the trial court noted that, despite an earlier Florida home study approving the great-grandparents as a placement, the trial court had previously declined to place Child with the great-grandparents.

18

We conclude that admission of the second, late-produced Florida home study did not harm the parents.

## B. The supported trial-court findings support the appointment of the Department.

Our conclusion that sufficient evidence supports the termination of parental rights resolves the remaining contention that, if clear and convincing evidence of scienter regarding engaging in conduct that endangers the child's physical or emotional well-being failed as to either parent, the appointment of the Department as sole managing conservator was an abuse of discretion. Having concluded that legally and factually sufficient evidence support the endangerment finding as to both parents, we overrule the challenge to the appointment of the Department. *See In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *20 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op.) (citing Tex. Fam. Code § 161.207(a)).

## CONCLUSION

Having found no reversible error presented, we affirm the decree of termination.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   February 7, 2025

19